WENDY J. OLSON, IDAHO STATE BAR 7634
UNITED STATES ATTORNEY
GEORGE W. BREITSAMETER, IDAHO STATE BAR NO. 2871
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
MARK L. WILLIAMS
TRIAL ATTORNEY
U. S. DEPARTMENT OF JUSTICE TAX DIVISION
WASHINGTON GROUP PLAZA IV, SUITE 600
800 EAST PARK BOULEVARD
BOISE, IDAHO 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1038

U S. COURTS
FEB 2 6 2013
Rcvd____Filed____Time____
ELIZABETH A. SMITH
CLERK, DISTRICT OF IDAHO

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>GARY BRINGHURST,<br><br>  Defendant. | CR No. 1:13-CR-45-BLW<br><br>INFORMATION |

The United States Attorney charges:

### COUNT I

Conspiracy to Commit Securities Fraud
Title 18, United States Code, Section 371
Title 15, United States Code, Section 77q(a) and (x)

Introduction

1.     DBSI, a conglomerate of companies headquartered in Meridian, Idaho, engaged in the acquisition, development, management and sale of commercial real estate properties

INFORMATION- 1

throughout the United States. DBSI sold a range of investment products, including tenant-in-common 1031 exchange interests (TIC investments), development fund investments, and other note and debt offerings. DBSI also heavily invested in a small number of emerging technology "start-up" companies.

2.  By at least 2006, the vast majority of DBSI's business and profits involved the sale of TIC investments pursuant to a "Master Lease." DBSI sold TIC investments through Regulation D (Reg D) Private Placements and, in so doing, provided prospective investors, as well as broker-dealers, with Private Placement Memorandums (PPMs) that purported to disclose accurate information about DBSI's finances and operations.

3.  In order to sell TIC investments, DBSI acquired commercial or residential real estate properties from unrelated third-party sellers and then, almost immediately, sold off fractional interests of the real estate properties to tenant-in-common investors (TIC investors). TIC investors purchased the properties from DBSI for a significantly higher price, oftentimes 20% - 30% more than DBSI paid for the real estate. In order to induce investors into investing with DBSI, and to justify the markup in price, DBSI master-leased the entire property from the TIC investors.

4.  The Master Lease was essentially a lease-back guarantee wherein DBSI would lease the real estate from TIC investors in order to sublease the real estate to commercial tenants. DBSI was entitled to all funds received from the commercial tenants. In return, DBSI paid each TIC investor an annual return of approximately 6% to 7% on their investment throughout the period of the master lease. During the period of the master lease, DBSI was responsible for all the costs of operating, managing, leasing and maintaining the property.

*INFORMATION- 2*

5.  As owners of the property, TIC investors were responsible for tenant improvements and capital expenditures on their respective property. DBSI collected "accountable reserves" from TIC investors, approximately 10% of a TIC investor's investment, which was in addition to a TIC investor's investment, in order to cover expected tenant improvement and capital expenditure costs. DBSI represented to investors that accountable reserves "represent funds paid to the Company (DBSI) by tenant-in-common buyers for future building improvements and leasing commissions related to the real estate properties that they buy. As the Company incurs costs related to building improvements and leasing commissions for the specific properties, the reserves are reduced. Any reserves remaining at the time that the properties are sold are payable to the respective owners."

6.  During 2008, DBSI offered TIC investments in the following properties: DBSI North Stafford, LLC; DBSI Oakwood Plaza Acquisition; DBSI Pinehurst Square West; DBSI Shoppes at Trammel LLC; DBSI Pinehurst Square East; DBSI Peachtree Corners Pavilion LLC; DBSI Florissant Market Place LLC; and DBSI Belton Town Center LLC.

7.  The TIC investments listed above were marketed to investors through a PPM, which was distributed to broker dealers and investors throughout the United States. Investors relied upon the accuracy of the disclosures in the PPM in purchasing TIC investments from DBSI.

### Object of the Conspiracy

8.  It was the object of the conspiracy to mislead investors, through false and fraudulent representations in PPMs and in other representations to investors, that DBSI was a financially strong company, and the Master Lease structure was a viable business model in order to induce investors to invest in DBSI. In 2007 and 2008, DBSI was dependent on money

*INFORMATION- 3*

received from new investors, including Accountable Reserves that were raised on the basis that said funds would only be used for improvements to an investor's property; when in truth and in fact, said funds were used to meets its prior obligations, including Master Lease payments.

## Manner and Methods of the Conspiracy

9. It was part of the conspiracy that beginning in January 1, 2007, the defendant and others, acting together and jointly, did knowingly and willfully, by use of the means and instruments of transportation and communication in interstate commerce and the United States mails in the offer and sale of securities by DBSI and related entities, namely, promissory notes, evidence of indebtedness, certificates of interest, fractional undivided interests, directly and indirectly, employ and execute a scheme, device, and artifice to defraud, and obtain money and property by means of untrue statements of material facts and by omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engage in transactions, practices and a course of business which would and did operate as a fraud and deceit upon the purchasers and prospective purchasers of said securities, said purchasers being generally that class of persons hereinafter referred to as "investors," whom the defendant and co-conspirators believed could be induced to invest and reinvest in said securities.

10. It was a part of the conspiracy to commit securities fraud, and the obtaining of money and property by means of false and misleading statements of material facts, and the engaging in the fraudulent and deceitful transactions, practices and course of business, that the defendant and others held senior management positions at DBSI and or related companies.

*INFORMATION- 4*

11.     It was part of the conspiracy that the defendant, and others, attended weekly cash meetings wherein they knew from said meetings that DBSI's business model was unsustainable and DBSI could only pay its existing obligations by raising funds from new investors.

12.     It was part of the conspiracy that the defendant, and others, attended weekly cash meetings wherein they well knew that if an accurate financial picture of DBSI were disclosed to the investing public, DBSI would be unable to attract new investors.

13.     It was part of the conspiracy that the defendant, D.S., M.E., J.S., D.S.2 and others, conspired and agreed to offer and sell TIC investments to investors knowing that DBSI business model was unsustainable. DBSI's financial condition was not as strong as portrayed in PPMs, which did not disclose that funds from new investors were required to pay its existing obligations to prior investors.

14.     It was part of the conspiracy that the defendant and others conspired and agreed to mislead investors. Among other things, said misrepresentations included:

    (a)     Representing to investors that "Accountable Reserves" would only be used "for tenant improvements, leasing improvements, leasing commissions and capitol improvements." These representations were false and misleading because the funds, in fact, were intentionally diverted and commingled with general funds of DBSI and applied for various uses, including, but not limited to the payment of interest payments to investors, general operations of DBSI, and investments by DBSI in technology companies. Investors were told that accountable reserves not used for the delineated purpose would be repaid "to the extent not used in the operation

*INFORMATION- 5*

of the Property"; when, in truth and in fact, DBSI did not have the financial ability to repay investors the Accountable Reserves it collected.

  (b) Falsifying financial statements of DBSI Housing, Inc., that were included in PPMs in order to represent DBSI as a financially strong company. Among the falsities, the value or net worth of DBSI Housing was fraudulently inflated. For example, PPMs represented that as of June 30, 2007, DBSI Housing, Inc., had a net worth of $105,900,419. However, the "assets" of DBSI included a material amount of "accounts receivable from affiliates," approximately $80,000,000, from emerging technology "start-up" companies. Despite representations in PPMs to the contrary, these funds were almost wholly uncollectible, as none of the technology companies had the ability to pay any debts owed to DBSI. Further, these "accounts receivable from affiliates" were fraudulently misrepresented as "current" assets, i.e., that the funds were collectible by DBSI within the next twelve (12) months despite many of the "loans" having notes that called for their repayment on dates more than twelve (12) months away. Further, these "accounts receivable from affiliates" were misrepresented to be "loans from affiliates" when, in fact, many of the technology companies were told that they did not need to pay back "the loans" to DBSI. In addition, the "accounts receivable from affiliates" was concealed from investors by offsetting said "receivables" against short-term liabilities in order to conceal from investors that a material amount of DBSI's equity was made up of uncollectible "loans."

INFORMATION- 6

    (c)    Misrepresenting DBSI's financial condition to investors by omitting from PPMs that the Master Lease Program, as described above, was incurring a material amount of losses and was not sustainable. For example, in 2007, the Master Lease program incurred approximate losses of thirty-four (34) million dollars. This was not disclosed to TIC investors. In fact, DBSI principals regularly misrepresented to investors, broker-dealers, and due diligence officers that the Master Lease portfolio was making money when, in fact, the master lease structure was not sustainable and lost more money each and every year.

    (d)    Misrepresenting DBSI's financial condition to investors by omitting from PPMs that funds from new investors were necessary to fund not only the existing obligations owing to existing investors under the Master Lease program, but that DBSI in its entirety was wholly dependent on funds from new investors. Prospective investors were not told that any and all future obligations due to them from DBSI, including fixed payments under the Master Lease, were contingent on DBSI's ability to raise funds from new investors.

15. From on or about January 1, 2007, through on or about November 30, 2008, in the District of Idaho and elsewhere, the Defendant did knowingly conspire, combine, confederate and agree with other persons known and unknown to the Grand Jury to commit the following offense against the United States of America:

    Willfully and knowingly, directly and indirectly, employ and cause to be employed said device, scheme and artifice to defraud the investors, obtain money and property

from them by means of untrue statements of material facts and by omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engage in transactions, practices and a course of business which would and did operate as a fraud and deceit upon the purchasers and prospective purchasers of said securities; all in violation of Title 15, United States Code, Section 77q(a) and (x).

## Overt Acts

16. On or about May 27, 2008, the defendant and others caused an electronic transfer of funds in interstate commerce from Montana to Idaho, in the offer and sale of a security, to wit: a TIC interest in the Oakwood Plaza LLC to R.H. and B.H., husband and wife, of Helena, Montana, in the approximate amount of $450,000.00, all in violation of Title 18, United States Code, Section 371, and Title 15, United States Code, Section 77q(a) and (x).

DATED this 25th day of February, 2013.

WENDY J. OLSON
United States Attorney

_____
George W. Breitsameter
Assistant United States Attorney

_____
Mark L. Williams
Trial Attorney
U. S. Department of Justice Tax Division

*INFORMATION- 8*